May it please the court I'm Mark Reichel with the Federal Defender's Office in Sacramento and I represent Brian Hammer. I was Mr. Hammer's trial counsel as well. I would note that I'm going to begin with discussions about the sentencing enhancement actually. The record is very clear that there are first of all three investors in this case and from the beginning of the case until the end of the case, including at sentencing as fact, the government's position was that these were family friends, that they were either very, very close friends or they were members of Mr. Hammer's family that he solicited investments from. On that point, did any of the witnesses say they had relied upon him being a lawyer? To the contrary. I know one witness said not. Yes, he said not. Did any of the witnesses say we relied upon his status as a lawyer, that made a difference? No. Ms. Holloway testified beginning of RT1 in the case and never made the statement. Mr. Foley is the second investor who testified, never discussed Mr. Hammer's background. Now, so Ms. Holloway discussed that they were very close family friends, that they traveled together and that they did all sorts of things together. They went on vacations together and she confirmed basically what all investors confirmed, which was specifically stated by Mr. McDowell that this was a close group knit of friends. Now, additionally, Ms. Holloway was asked by the government very early on, what did Mr. Hammer tell you that he did? She said, I believe he was a tax attorney, a CPA, and previously had worked for a big eight firm. But primarily – Was any of that true? Yes, it was. Mrs. Hammer testified at trial. Was he a CPA? He was. I believe he was a CPA. He did work in San Francisco here for a big eight firm. He has an accounting degree. And I believe, yes, he did have a CPA degree. That was introduced as an exhibit at trial. He also had a law degree. He just – He had an accounting degree. He said he had an accounting degree. That's not necessarily the same as being a qualified CPA. I believe he had become a qualified CPA, and I apologize for a lack of familiarity with that part of the record. But he did attend a law school in Los Angeles, but it was Western University of Law or something. But that was also admitted at the trial. Additionally, his mother attended Stanford University and was a Stanford alumnus, and that was introduced as an exhibit and undisputed at trial. And they did take the Holloways, and this was discussed at the trial, to the Stanford alumni camp. And we believed at trial and pointed that out that that may have been some of the confusion for Ms. Holloway, who at any point believed that he had attended Stanford University for his law degree. Mr. Reckle, whether the family friends relied upon the fact that he was a CPA and an accountant, he told them that he was president of CalWax. Absolutely. And even family friends, even people who have a personal relationship with somebody, might take additional comfort in providing investment funds to someone, to a personal friend, who was representing himself as the CEO of a company. In other words, it would suggest that he knew the company very well. They might have both confidence in him because of their friendship and would be comforted that this company might be well-directed because he was the CEO. Why isn't that appropriate under the guidelines? I completely agree with the court statement just now. I mean, I do agree that in that type of investment, if he purports to be the president of that company or General Motors, of course I think you're going to take comfort. However, the problem is that at sentencing, the government bears the burden of proof on that enhancement. And the government sat by and agreed with the probation report. And the probation report specifically noted as follows that, number one, the reason this should apply, and these are the facts that I was prepared to defend at sentencing. What page are you on in the PSR? I'm sorry. What page? I'm actually quoting from page 12 of the appellant's opening brief, which pastes in exactly what the court ruled and exactly what the probation department used. It is the PSR to page 6, Your Honor. And it states there the probation department believes the enhancement applies because, number one, he represented that he was a practicing attorney and investment advisor. And I believe only one of the three even said anything about him being an attorney, and there was never any connection with that whatsoever to the reason they invested or their feeling of trust. Secondly, it says he was able to take advantage of the investors without fear of quick notice. And two reasons are listed. The distance between the investors, and of the three investors, Mr. Folliott lived in Canada, but the other investors lived nearby. There was no dispute about that. They traveled together at a minimum of four times a year, it appeared to be. They spent summers together in a cabin up in Pinecrest, California. So the distance only applies to Mr. Folliott. And that was in conjunction with, according to the probation department. That's paragraph 18 of the PSR. On paragraph 19, the PSR, citing to a Tenth Circuit case, points to a case where someone represented himself to be a company president and investment advisor. And then the PSR says, similarly in this case, Hammer represented himself as the owner of CalWax, received investor capital, had exclusive control over the investment capital, and spent it as he saw fit. Why doesn't that fit within note two of the sentencing guidelines? That's the note that specifically addresses where a defendant represents himself to be something but is not. In Lauder, the Tenth Circuit opinion, Lauder, discorded by the court, the individual was a CPA and was an investment advisor. And these were actually clients of his that invested the money. These were trust funds held in a fiduciary relationship, which he then spent on personal business exactly as Mr. Hammer's spending of the money. However, these were actual clients, and the relationship, I think, was a clear fiduciary relationship. And by his additional representation that he was the president and he was the owner of that company in the Lauder case, I believe that in conjunction with the fact that there was a fiduciary relationship significantly advanced his ability to conceal this from them. In Mr. Hammer's case, to me, Ms. Holloway took the stand and immediately said that when she first talked to Mr. Hammer about this investment, she pulled up a Dun & Bradstreet report that her father was an investment advisor and she got a Dun & Bradstreet report and read it about CalWax. Well, Mr. Hammer said he was in the process of buying it at that time.  I mean, thereafter, within the next year, two years, three years, would be able to either make a phone call to that company to do another Dun & Bradstreet. I mean, it seems to me that this is, from 14 years as a federal public defendant, this is a very common scam, a white-collar scam, where someone has induced someone close enough to them to depart with the money. However, it would have been so easy to discern a phone call, the Internet, a variety of ways, for the probation department to say an enhancement should apply here, because it was difficult to discern. It's just not true. I mean, it just couldn't be less true, very clearly to me. It's very simple, the way the money was taken. It's almost equivalent to theft. He said he owned a company. He clearly did not own the company. They parted with the money. They parted with the money because of the familiar relationship that they had, and they all testified to that. That's what it was all about. The government did not prevail in enhancement for vulnerable victims in the district court, which is where they came after, and I thought they had a better chance of prevailing. But to get a position of trust just because you took the money, to me, it doesn't apply. And it would apply in every single case where there's an investment and there's fraud involved. And, therefore, I think that there's quick notice by the investors that could have been discerned immediately. I'd like to leave the remaining two minutes for rebuttal.  Thank you, Your Honor. We'll hear from the government at this time. Ms. Spangler. May it please the Court, Samantha Spangler for the United States. Good morning.  Thank you, Mr. Chief Justice. I have been familiarized myself with the record, and I would like the Court to refer to the supplemental excerpts of record starting at page 139. There's a trial stipulation there indicating that Mr. Hammer was never licensed to practice law in the State of California, never admitted as a member of the State Bar of California. He was never licensed by the California Board of Accountancy as a certified public accountant. He did not attend the University of California at Los Angeles School of Law, and he did not attend Stanford University School of Law. So whenever he said that he was an attorney, a tax attorney, a CPA, he was lying. If he said he was an accountant, to the extent that he had an accounting degree. He had a law degree in San Fernando Valley. He did not have a law degree. San Fernando Valley hadn't conferred the degree on him. I understand the difference between having a degree conferred and being admitted to the bar. And you just told us that they stipulated that he was never admitted to the bar. That would be different from having a degree. And that he didn't get a law degree from the schools. Well, that's true. He didn't attend UCLA, but he did attend a law school. And it's a law school that would have qualified him to take the bar, at least sit for the bar in California. He also represented to at least one of the victims who testified that he had said that he had taken the bar, but he had never practiced. Okay. Is there whatever the range of truth or falsity, and the record indicates it goes way on the side of falsity of the representations about being an accountant, being a lawyer, being a graduate of a prestigious school. Did any of the victims in sentencing say they relied upon this? Not during the sentencing, Your Honor, but during the trial. The first witness whose testimony is set forth in the excerpts of record, Ms. Holloway, testified that she, in fact, relied on his being an attorney, his statements that he was an attorney and an accountant, in not doing further investigation. And there was a case called, I believe it's pronounced Iannone, out of another circuit. There's a very thoughtful examination in that case. It's very similar to this case in some of the arguments that were raised there. One of them was that what was what the people that invested were really relying on was the fact that the defendant was their friend. And the Court rejected that because it wasn't the friendship that was the basis for the abuse of trust enhancement. It was the fact that he had represented himself as the person who solely owned and operated the company that he was asking them to invest in. He had also represented himself as a war hero. I'm sorry. I'm sorry. What evidence in the record, either at sentencing or in the transcript, supports the notion that the investors relied upon his statements that he was the CEO of this company? The transcripts are replete with his their testimony at trial of his representations to them. My question goes to reliance. Reliance. Well, I mean, the reason they invested in this company at all was because he told them about this investment opportunity with Cowax, his company. If they had known that he didn't own the company, they would not have invested. Did they say that? And I think that I think that they Excuse me. Did they say that? Yes, that's what I'm trying to say. I think the best evidence of that, that they did say that, was from witness folio. And I believe, though, that Ms. Holloway testified to that as well. Yep. Do you have record sites for those that you can provide? Let's see. My first note regarding Ms. Holloway is at ER 13. I don't have specific page sites for folio's testimony. But the testimony of folio and Holloway are both set out in full in the excerpts of record. And when you read their testimony, the overall flavor of it is that they relied on what this guy was saying. Why don't we do this? Why don't, post-argument, you provide the clerk of court with a letter, say, not to exceed five pages, that identifies the transcript record citations that support the government's argument that the victims relied upon the assertion that he was an accountant, that he was a lawyer, that he was a graduate of a prestigious law school, and that he was the CEO of this company. And then we'll give the public defender's office, five days after receipt of that, to supplement with their citations to the record that they feel might counter this. Why don't we do that? And you said not to exceed five pages. And how soon did you want that after the argument? What's enough time for you? I could get it in a week. How about ten days? Ten days. Thank you, Your Honor. Okay. Go ahead. Okay. Other interesting points about the Iannone case was, besides the fact that the defense the defendant was a friend of the people that he induced to invest in this bogus company. That's specifically outside the enhancement we've been talking about, though, isn't it? That's exactly right. The defendant had argued that you can't enhance my sentence because of the abuse of trust because the reason these people invested with me is that I was their friend. And the Court said, no, you're misunderstanding the character of the abuse of trust enhancement. The issue is, when there is a position of trust, the investors are less likely to do the diligence that they would ordinarily do if they had an arm's-length transaction. And that doesn't have to do with the friendship. It has to do with the position of trust that the person held. And in Iannone, as with Mr. Hammer, that position was he represented himself to be the CEO of a bogus corporation. But the application notes say is this clearly applies for an investment advisor, for a trustee, that sort of thing. But it doesn't apply at the other end of the scale where it doesn't apply. It doesn't apply where the reliance is based upon pure friendship, right? Pure friendship is not what we're relying on. You're saying it's closer to the position of trust than it is to friendship. Your opponent is arguing that it's pure friendship. Right. We understand. And there's also the spectrum of bank teller versus manager. We are arguing that this is closer to the manager rather than to the bank teller end, in part because while the bank teller is out there in the open and subject to close supervision, the manager is not. The manager is more behind the scenes. And in this case, Mr. Hammer was also not subject to supervision. He got a hold of their money and that was the end of it. They didn't have the ability to get the records of the financial records of the company. In fact, Mr. Folio's e-mails to Mr. Hammer at one point asked for such records and he was not forthcoming with them. Another case I'd like to point out is the Velez case from this circuit, which Judge Lay authored for this circuit, which states that it doesn't have to be an employee-employer relationship and it also doesn't have to be a fiduciary relationship. With that, unless the Court has any further questions. I'm just concerned. Some of these investors said that Hammer's position and educational background really had no connection with their investment, whereas others, as you point out, Holloway and perhaps Folio, say to the contrary. Now, what does the Court do under those circumstances? Do they look at the overall effect of the testimony or can you rely upon, do all of them have to say it's a position of trust? I think that the Court could look at each individual victim and then look at it collectively. If one victim relied on him because of his skill as an attorney as well as the fact that he was the CEO of the company, you can affirm the abuse of trust enhancement on that basis. If another investor like Mr. Folio didn't necessarily rely on him because of his attorney and CPA skills, but because of the fact that he was the alleged CEO of this alleged company, I think you can still enhance. If he were the only victim, I think that that would support the enhancement. And so individually, each of those would be supported, and therefore collectively they would be supported. Thank you, Your Honors. Thank you very much.   Thank you.  Thank you, Mr. Hedges. Thank you. Roberto. Yes. I think I'd go further. I believe that there's no way that this circuit should decide that in fraudulent transactions where there is no connection between the defendant and the company he purports to have a position with. If he doesn't actually have a position, it, to me, would stand, I think it's faulty reasoning for the guidelines to find that that position he purports to have. Do you want us to overrule the guidelines? No. Can we do that? Not in this case, Your Honor. But I think that Louder, to be honest with you, other than the fact there's a fiduciary responsibility in Louder, clearly between those investors. Can I ask you to specifically respond to Government Counsel's argument that Folio testified at trial that the CEO status was important reliance? I believe it's at page 2. He says it's a family matter repeatedly. In fact, when the money's not forthcoming at the supplemental excerpt of record, page 70, and he notes to Brian Hammer, the situation has gone from ridiculous to serious. You're leaving me no recourse. I tell him in that email that I don't believe that his conduct is acceptable when it comes to business, let alone a family relationship. And I'm sorry that he fails to understand that. He testifies repeatedly. But that suggests a mixed motive, doesn't it? I'm investing with this U.V. because you're nearly like family to me, and it's also a business relationship. That does have a mixed motive there. And when we have people who are looking at Dun & Bradstreet, that suggests that it's not merely a family relationship, doesn't it? We have somebody who's attempting to verify. In other words, if I could go to a family member and say, look, here's $10,000. Do whatever you want with it. Let me know how it turns out. That would be a family relationship, whether or not they were representing to other people that they were a CEO. And I think it seems simply a purely family relationship if they do go run a Dun & Bradstreet to do Internet research, I believe. Okay. I agree. I think we understand your arguments. Let me make clear about these letters. We don't want argument. We simply won't want citation to the page and, if necessary, the line where the testimony occurs. Understood? Okay. Thank you both very much. We appreciate your arguments. The case just argued will be submitted for decision and will now proceed to Myers v. Redwood City of Council. We'll come forward, please.
judges: Lay , Hawkins, Bybee